J-A16008-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| RAELYNN ZIELINSKI | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RICHARD F. BUJAK | : | |
| | : | |
| Appellant | : | No. 1516 WDA 2025 |

Appeal from the Order Entered November 10, 2025
In the Court of Common Pleas of Allegheny County Family Court at
No(s): FD-12-003606-005

BEFORE: McLAUGHLIN, J., KING, J., and BENDER, P.J.E.

MEMORANDUM BY McLAUGHLIN, J.:        **FILED: August 14, 2026**

R.F.B. ("Father") appeals from the order granting the petition for modification of custody filed by R.Z. ("Mother"). He argues the court erred in applying the custody factors, ordering him to pay a portion of the cost of the custody evaluation, and finding him in contempt. We affirm.

Mother and Father are parents to two children A.B., who was age 13 at the time of the order at issue, and D.B, who was age 9. Mother and Father had shared legal and physical custody under an April 2022 consent order giving Father physical custody from Sunday through Wednesday morning.

In February 2024, Mother petitioned for modification of custody. In May 2025, the court ordered the parties to engage a custody evaluator. Mother also filed petitions to hold Father in contempt of the April 2022 order for not responding to Our Family Wizard messages and not ensuring Children took medication.

The court held a trial in September 2025. The court accurately summarized the testimony. Trial Ct. Op., filed Feb. 18, 2026, at 4-24 ("Rule 1925(a) Op.").[1] We will provide a brief summary here. The court interviewed Children who said that they share a room at Father's house, A.B. does not feel comfortable going to Father with her problems, Father and Paternal Grandmother speak negatively about Mother, and D.B. feels safer in Mother's care. *Id.* at 4-7. They stated that Paternal Grandmother and Father's aunt do the majority of the cooking at Father's house and that there are loud arguments at Father's house. *Id.* at 6-7.

The custody evaluator, Dr. Melody Caldwell, testified that she is a licensed psychologist. *Id.* at 7. She interviewed Mother, Mother's husband, and Father, and conducted sessions with the parties and Children. *Id.* She found Mother was "cooperative and forthcoming." *Id.* at 8. She explained that Father refused to answer most questions or provided sarcastic responses, and was "verbally combative." *Id.* (citation omitted). She further said that he did not provide information as to his employment, whom he lived with, or who cared for Children. *Id.* She noted that Father minimized or disregarded A.B.'s mental health issues, which included emotional dysregulation and hurting

---

[1] The certified record contains the notes of testimony from the interview with Children but not the notes of testimony from the hearing, which are in the reproduced record. No one has disputed the accuracy of the notes of testimony contained in the reproduced record, and we have used that to ensure the record supports the court's factual findings. *See* Pa.R.A.P. 1921, Note (providing that "[w]here the accuracy of a pertinent document is undisputed, the Court could consider that document if it was in the Reproduced Record, even though it was not in the record that had been transmitted to the Court").

animals. *Id.* Dr. Cardwell had concerns regarding the fact that Children shared a bedroom at Father's house because D.B. was exposed to A.B. masturbating. *Id.* at 9. Dr. Cardwell also noted that if she had not asked questions during the interactional evaluation of Children and Father they might have sat quietly for the whole session. *Id.* at 10. Dr. Cardwell recommended that Mother have sole legal custody and primary physical custody until Father completed mental health treatment and resolved safety concerns at his home. *Id.* at 11. She also recommended that Children have separate bedrooms. *Id.* Dr. Cardwell stated that although Mother had post-traumatic stress disorder ("PTSD") and may be dysregulated at times, she had regular treatment and providers, had completed two intensive outpatient programs, had a psychiatrist, and took her medication. *Id.* at 12. She found Mother's mental health issues did not affect Children's safety because Mother knew how to seek, obtain, and maintain appropriate treatment. *Id.* Dr. Cardwell noted Mother was a medical marijuana patient and reported regular use. *Id.*

Dr. Cardwell reported concerns regarding A.B.'s mental health, noting A.B. had desires to injure and kill animals. *Id.* She stated that this gave her further concern about Children sharing a room because Mother had reported that A.B. had been "pretty violent" with D.B. *Id.* at 13 (citation omitted). The court noted that Father "act[ed] out" while in the courtroom during Dr. Cardwell's testimony. *Id.*

A.B.'s therapist Hannah Davy testified that A.B. had been referred to the clinic where she worked because she had suicidal thoughts. She stated

- 3 -

that A.B.'s care had been delayed because the clinic could not reach Father to obtain his approval. *Id.* at 14.

Mother testified that she had remarried and had a stepson. *Id.* Mother went to meetings about accommodations A.B. needed at school, knew Children's medical and dental providers and activity schedules, and provided notice of each to Father. *Id.* at 15. Mother said she obtained a Protection from Abuse Act ("PFA") order, in 2019, after a verbal argument between her and Father turned physical and Father choked Mother and kneed her in the ribs. *Id.* A final PFA order entered by consent had custody provisions for supervised visits. *Id.* Mother testified that as the custody case progressed, Father's custody time expanded. *Id.* She reported that with the increased time, Children began to exhibit angry and violent behaviors. *Id.* at 15-16. Mother said that Father did not answer messages through Our Family Wizard, even though ordered to do so. *Id.* at 16. She testified that Father did not become involved in Children's treatment, activities, or appointments and that Father was often late for and acted out at exchanges. *Id.* at 16-17.

Mother testified A.B. was diagnosed with PTSD, adjustment disorder, and major depressive disorder, while D.B. was diagnosed with PTSD, hypersensitivity processing disorder, and disruptive disorder. *Id.* at 17. Further, A.B. received her medication at school because Father was not providing it during his custody time. *Id.* Mother expressed concern regarding overnight custody because Children were with Paternal Grandmother and her boyfriend at night, while Father was at work, and there were many arguments

in the home. *Id.* at 18. The court stated that Father interrupted, muttered, and gesticulated during Mother's testimony. *Id.* at 17.

Paternal Grandmother testified that she had partitioned Children's room with fabric stretched on opposite sides of a bunk bed that is in the center of the room. *Id.* at 19. She stated there were not regular arguments in the home. *Id.* She said that Father works overnights and sleeps while Children are at school. *Id.* at 20. Paternal Grandmother testified that she did not believe Children needed to take medication or see therapists or psychiatrists, as she believed Mother exaggerated to the treatment providers. *Id.* at 21-22. The trial court pointed out that Father again acted out during cross-examination of Paternal Grandmother. *Id.* at 20.

Paternal Grandmother's fiancé testified that he did not believe Children needed mental health treatment. *Id.* at 22. Father's aunt testified that Paternal Grandmother does the cooking in the house. *Id.*

Mother called Father as a rebuttal witness, and the court found he was "combative and evasive" and offered short, argumentative responses. *Id.* at 23. He testified that he attended about 10 medical appointments in Children's life and did not participate in their mental health treatment. *Id.* Father believed A.B.'s participation in the mental health program regarding suicidal ideation was unnecessary and he did not agree with a recommendation that she transition to a trauma informed therapy program. *Id.* His counsel asked whether he would ensure Children took their medication, and he stated, "When I can, yeah." *Id.* (citation omitted).

The trial court granted the petition to modify. It awarded Mother sole legal custody and reduced Father's physical custody time. It gave Father custody on Sundays from 1:00 p.m. to 8:30 p.m. and Tuesdays after school until 8:30 p.m., but would not have custody overnights. The court also found Father in contempt and ordered him to pay Mother $500 in counsel fees.

When the court issued its custody order, it made findings as to each custody factor:

**1. Which party is more likely to ensure the safety of the Child**

Mother has actively engaged with A.B.'s and D.B.'s mental health providers, and is the person that A.B would like to be contacted (in personal crisis plan) in the event that she is feeling unwell or unsafe.

Father has not participated in either child's mental health treatment. [Paternal Grandmother], with whom Father lives, and upon whom he relies for childcare, indicates that the children are fine when they are with her, and therefore, they do not have mental health issues. [Paternal Grandmother's] partner indicated that they believe that Mother has convinced the children's doctors that the children have PTSD for her own reasons. Father testified that the STAR program (an intensive outpatient program for children who are at risk for suicide) was unnecessary for his daughter. He believes that Mother is abusing the mental health system and "putting words in their mouth." When the STAR program was reaching out for Father's consent to allow A.B. to step down into trauma therapy, he did not respond. Mother alleges that Father does not give the children their psychotropic medication when the children are at [Paternal Grandmother's] house. Father does not know what medications the children take and for what purpose.

Father is unable to provide separate bedrooms for the children, as he himself sleeps on a couch at his mother's house. Due to some inappropriate sexual activity between

the children, and their ages, it is recommended that the children have separate bedrooms.

The children testified during their in camera interviews that the household where their Father lives, [P]aternal [G]randmother's house, is loud and chaotic, with frequent arguments.

Mother testified that she takes the children to all of their appointments. They have separate bedrooms at her house. She takes the younger child to his craniofacial appointments and therapy appointments.

*This factor favors Mother.*

**2. The present and past abuse committed by a party or member of the party's household, which may include past or present protection from abuse or sexual violence protection orders where there has been a finding of abuse.**

There was domestic violence during the time that the parties were together. Mother received a two-year Protection from Abuse Order in April of 2019 that allowed for Father to have supervised custodial time with the children. It is alleged that both children suffer from PTSD as a result of witnessing these incidents. Mother reports that she remains afraid of Father. There have been no incidents of physical abuse since separation.

*This factor slightly favors Mother.*

**2.1 The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).**

*n/a*

**2.2 Violent or assaultive behavior committed by a party**

*See above.*

**2.3 The level of cooperation and conflict between the parties, including:**

**i. which party is more likely to encourage and permit frequent and continuing contact between the child**

**and the other party or parties if contact is consistent with the safety needs of the child; and**

There is a high level of conflict and a very low level of cooperation between these two parties.

It was noted by the custody evaluator, Dr. Caldwell, that [Father] seemed to be angry and resentful of the court system and [Mother]. [Father] evidenced his dislike and disdain for [Mother] in court, making faces and rolling his eyes when she, or her concerns, were discussed. [Father] told the custody evaluator that his main goal was to minimize contact with [Mother]. [Mother] testified to having difficulty communicating with [Father], her frustration with his refusal to respond to messages, and her desire to have him overcome the barriers to healthy co-parenting communication.

*This factor favors Mother.*

**ii. the attempts by a party to turn the child against the other party, except in cases of abuse where reasonable safety measures are necessary to protect the safety of the child. A party's good faith and reasonable effort to protect the safety of a child or self shall not be considered evidence of unwillingness or inability to cooperate with the other party. A party's reasonable concerns for the safety of the child and a party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party. A child's deficient or negative relationship with a party shall not be presumed to be caused by the other party.**

It is difficult to imagine that Father does not express his disdain for Mother openly in front of the children, since he did so repeatedly in court. This Court does not believe that this is an attempt to turn the children against Mother, rather simply an inability to control his negative emotions.

*This factor favors Mother.*

**3. A willingness and ability of a party to prioritize the needs of the child by providing appropriate care, stability and continuity for the child, considering the parental duties performed by the party on behalf of**

**the child in the past and whether the party is willing and able to perform the duties in the future, and attend to the daily physical, emotional, developmental, educational and special needs of the child.**

Mother has been the primary caregiver for the children since their birth, scheduling medical, dental and mental health appointments. Father does not go to appointments. A.B. has a 504 plan at school. Father has never participated in meetings regarding that plan. Father does not provide a home for himself and his children; rather, he exercises his custodial time at his mother's house. He works from 5:30 p.m. to 10:00 p.m. on Monday, Tuesday, Thursday, Friday and Saturday. He is frequently asleep when the children are at his mother's house. Much of the care of the children while in Father's custody appears to be provided by [P]aternal [G]randmother.

Father does not actively participate in the children's school, doctors, or mental health treatment.

*This factor favors Mother.*

**4. The need for stability and continuity in the child's education, family life and community life.**

Mother makes and takes [C]hildren to all appointments and is involved in their school and extra-curricular activities. Father does not participate. [Father] failed to meaningfully participate in the [c]ourt-ordered Custody Evaluation, frequently answering the questions of the evaluator with hostility, sarcasm, or simply refusing to answer. It is difficult to ascertain what his contribution to the children's lives are. His answer to the evaluator's question about what specific outcome he would like for the custody trial to have was "I want her to leave me the fuck alone. Whatever that takes." This calls into question his desire to effectively parent his children.

*This factor favors Mother.*

**5. The child's sibling and other familial relationships.**

The children have always lived together.

- 9 -

Father has family members with whom he resides, and with whom the children have relationships; however, Dr. Caldwell suggests that it does not appear that these family members are providing support and safety.

At Mother's house, they have a step-father that they call dad, and a step-sibling with whom they appear to get along. Dr. Caldwell notes that [Mother's] household provides a supportive environment that provides for the children's emotional needs.

*This factor slightly favors Mother.*

**6. The well-reasoned preference of the child, based on the child's maturity and judgment.**

The children participated in an in camera interview with the Court. Both children described a chaotic and loud environment at their paternal grandmother's house. Both children expressed a desire to spend less time at the grandmother's house with their father. Notably, during the interactional portion of the custody evaluation, [Father] did little to engage the children, nor did he encourage dialogue between them. A.B. told the evaluator that during her time with her father, he is "usually sleeping on the couch, playing video games, or goes outside to smoke."

*This factor favors Mother.*

**7. The proximity of the residences of the parties.**

The distance between the parties is not substantial and does not impact the custody decision.

**8. Each party's employment schedule and availability to care for the child or ability to make appropriate child care arrangements.**

Both parties are able to manage child care and their employment schedules for the children.

**9. The history of drug or alcohol abuse of a party or member of a party's household.**

No significant evidence was presented regarding this factor.

- 10 -

**10. The mental and physical condition of a party or member of a party's household.**

Father clearly suffers from some type of deficiency in regulating his emotions. This Court noted several instances where Father was unable to control his responses to the testimony. This took the form of talking to himself and gesturing, and nodding and smirking during cross-examination of Dr. Caldwell. At several points in the trial, the Court had to admonish [Father] for his inability to sit quietly and listen to the testimony of witnesses. During his own testimony, he was sarcastic, angry and dysregulated.

Father's OurFamilyWizard messages were combative, and he was combative during his testimony as well. Dr. Caldwell noted that communication with [Father] was incredibly difficult.

Father essentially refused to participate in the custody evaluation conducted by Dr. Caldwell. He refused to answer questions or provide information about the household where he resides. His answers to the MMPI indicated that he was not being forthcoming in his responses.

Mother had elevated scores on many sections of the MMPI. She has had significant distress in her life; however, Dr. Caldwell expressed no concern about Mother's ability to exercise custody of the children.

*This factor favors Mother.*

**11. Any other relevant factor.**

Trial Ct. Op., filed Oct. 31, 2025, at 2-7.

Prior to trial, the court had ordered that parties to "complete Full Custody Psychological Evaluations by separate Order of Court," with Mother responsible for 100% of the cost. Order, filed May 8, 2025. In the detailed order requiring the custody evaluation, the court stated, "The cost of the evaluation shall be $4,500.00. The cost of the evaluation shall be preliminarily allocated between the parties with the petitioner paying $4500.00 (100%) and

- 11 -

the respondent paying $00.00 (0%) without prejudice to the ultimate apportionment of such costs by subsequent agreement of the parties or order of court." Order of Court: Full Custody Evaluation, dated May 15, 2025, at ¶ 5. Later, in the October 2025 custody order, the court ordered Father to pay Mother $2,500 for "his portion of the cost of the Full Custody Evaluation[.]" Order, dated Oct. 31, 2025, at ¶ 4.

Father appealed and raises the following issues:

> 1. Whether the trial court erred in granting Mother's modification petition and by failing to weigh all custody factors of 23 Pa.C.S.A. [§] 5328 and consider evidence of record to determine that a modification of the existing custody order be in the best interest of the Children.
>
> 2. Whether the trial court erred in granting Mother's petition for modification of custody and in ordering Father to pay half of the cost of the custody evaluation d[e]spite the lower court's prior order directing Mother to pay for the full cost of the evaluation.
>
> 3. Whether the trial court erred in holding Father in contempt of the April 18, 2022, custody order.

Father's Br. at 3 (suggested answers omitted).

Father claims the trial court erred in granting Mother's modification petition and failed to consider and weigh evidence and evaluate all custody factors to determine if modification was in Children's best interest. He maintains he proved the factors were neutral overall and did not justify a modification.

He first argues the court failed to properly consider the evidence related to factor 1—which party is more likely to ensure the safety of the child. He

claims that the fact that he "let[] Mother control the medical appointments . . . does not show that he is failing to ensure safety to the children." Father's Br. at 15. He claims he did not interfere with the medical treatment. According to Father, he made sure A.B. took her medication, and he notes that Paternal Grandmother testified she also verified that A.B. took her medicine. Father further argues that A.B. testified that she took her medication at both houses, and that she set an alarm to take her medication when at Father's house. He also maintains that although Children initially shared a bedroom, the room was now partitioned.

Father next argues the court erred in finding that Factors 2 and 2.2 slightly favored Mother. He maintains there had been no allegations of abuse since 2019 and the parties have been able to share custody since 2022. He argues the court should have found the factors were neutral.

Father claims the court erred in weighing factor 2.3—which party is more likely to encourage and permit contact. He argues he was distressed at trial and had difficulty sitting still, but claims there was no evidence he inhibited or prevented Children from seeing Mother. He points out that Mother did not allege he withheld Children and notes that Mother acknowledged that he read the messages she sent on Our Family Wizard. He argues that by finding it was "difficult to imagine that Father does not express disdain for Mother openly in front of [C]hildren," the court made an assumption that was not based on the evidence. *Id.* at 20-21 (citation omitted).

Father also argues the court erred regarding Factor 3—the willingness and ability to prioritize Children's needs by providing appropriate care, stability, and continuity. He argues he should not be penalized for letting Mother handle the appointments and should not be excluded from offering input. He also claims the court penalized him for not being able to afford his own house and due to his financial status and income.

Father next argues the court failed to consider evidence relevant to factor 4—the need for stability and continuity in Children's education, family life, and community life. He argues the April 2022 consent order provided stability and continuity, but the modified order eliminated the stability and continuity with Children's extended family.

Father claims the court failed to consider evidence related to and to properly weigh factor 5—sibling and familial relationships. He claims that Dr. Cardwell suggested Father's extended family did not provide support and safety without interviewing the individuals and without requesting to meet them.

Father claims the court erred as to factor 6—the preference of Children. He claims the court should not have interviewed Children together before interviewing them separately. He claims it created a situation where the younger child would simply agree with the older child. He maintains the court asked leading questions. He also points out that when the court asked A.B. what she wanted, she said she wanted one less day at Father's house, because she "still want[ed] to see" Father. *Id.* at 25-26.

Father claims that for factor 9—history of drugs and alcohol abuse—the court ignored that Mother used marijuana on a regular basis. He maintains that although she has a medical card for its use, she uses it regularly and is under its influence around Children. He argues it impairs her decision making, slows her reaction time, distorts her perception, and affects her judgment and impulse control.

Father maintains that for factor 10—mental and physical condition of parties—the court made a medical diagnosis, that is, that he suffered from some type of deficiency in regulating emotions, that it was not qualified to make. He claims the court ordered him to go to anger management classes based on the diagnosis.

When this Court reviews a custody order, we must "accept the factual findings of the trial court that are supported by competent evidence of record and . . . defer to the trial court's weighing of the evidence." *S.S. v. K.F.*, 189 A.3d 1093, 1098 (Pa.Super. 2018). This is because "the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record." *Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa.Super. 2006) (citation omitted). We will only reject a trial court's decision if it is unreasonable in light of the court's sustainable findings, involves an error of law, or constitutes an abuse of discretion. *S.S.*, 189 A.3d at 1098.

In any custody determination, "the best interest of the child is paramount." *Smith v. Smith*, 281 A.3d 304, 311 (Pa.Super. 2022). The court

must determine the best interest of the child when ordering any form of custody "by considering all relevant factors, giving substantial weighted consideration to the factors specified under paragraphs (1), (2), (2.1) and (2.2) which affect the safety of the child[.]" 23 Pa.C.S.A. § 5328(a). The factors are:

> (1) Which party is more likely to ensure the safety of the child.
>
> (2) The present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.
>
> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
>
> (2.2) Violent or assaultive behavior committed by a party.
>
> (2.3) The level of cooperation and conflict between the parties, including:
>
> > (i) which party is more likely to encourage and permit frequent and continuing contact between the child and the other party or parties if contact is consistent with the safety needs of the child; and
> >
> > (ii) the attempts by a party to turn the child against the other party, except in cases of abuse where reasonable safety measures are necessary to protect the safety of the child. A party's good faith and reasonable effort to protect the safety of a child or self shall not be considered evidence of unwillingness or inability to cooperate with the other party. A party's reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party. A child's deficient or negative relationship with a party shall not be presumed to be caused by the other party.

(3) A willingness and ability of a party to prioritize the needs of the child by providing appropriate care, stability and continuity for the child, considering the parental duties performed by the party on behalf of the child in the past and whether the party is willing and able to perform the duties in the future, and attend to the daily physical, emotional, developmental, educational and special needs of the child.

(4) The need for stability and continuity in the child's education, family life and community life, except if changes are necessary to protect the safety of the child or a party.

. . .

(6) The child's sibling and other familial relationships.

(7) The well-reasoned preference of the child, based on the child's developmental stage, maturity and judgment.

. . .

(11) The proximity of the residences of the parties.

(12) Each party's employment schedule and availability to care for the child or ability to make appropriate child-care arrangements.

. . .

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).[2] The trial court must determine "which factors are most salient and critical in each particular case." ***Taylor v. Smith***, 302 A.3d 203, 207 (Pa.Super. 2023) (citation omitted).

---

[2] The General Assembly deleted factors (5), (8), (9), (10), and (13) when it amended Section 5328(a) in 2025.

Here, as set forth above, the court analyzed each custody factor, referencing the relevant facts to support its analysis for each factor. Further, it issued a Rule 1925(a) opinion, further explaining its reasoning. It found that the evidence established "Father does very little in [] Children's life" and "expressed little concern over ensuring A.B. receive[d] her daily medication." Rule 1925(a) at 24. It concluded that the evidence supported reducing Father's custody time by removing overnights and awarding Mother sole legal custody. *Id.* at 25. It found Mother was dedicated to Children's mental and physical health, would ensure their safety, and would consult Father and seek his opinion. *Id.* at 25. The court determined the reduction in overnight visits was needed because of Father's lack of involvement when Children were in his care and the presence of safety concerns in his home. *Id.* It found that, given A.B.'s history of violence and aggression toward animals, it was not safe for Children to share a room, particularly as A.B. was masturbating in front of D.B., and the fabric partitions did not alleviate the concerns. *Id.*

For the factors discussing safety of Children, the court found that Mother used cameras and alarms to ensure that A.B. did not harm animals, but Father did not address the issue and could not provide a safe sleeping space, considering A.B.'s masturbating in front of D.B. *Id.* at 30-31.

The court stated that it had noted Father's conduct and demeanor in the courtroom because it confirmed other witnesses' observations, including Dr. Caldwell's. It explained that the observations confirmed the witnesses' testimony about Father's disdain for Mother. It stated, "If Father is unable to

control his behavior in the presence of this Court and in the presence of Dr. Caldwell, it is hard to fathom that he is regulated and stable in his day-to-day life." *Id.* at 33.

For the factor considering the provision of needs, the court found that Father did little to provide for Children's needs and welfare. It noted that he slept and worked for a good portion of the custody time and Paternal Grandmother provided most of the care. *Id.* at 33. The court also observed that Father refused to participate in Children's mental health care. *Id.* The court stated it had considered Children's relationship with Father's extended family, finding they would still see the family during the custody times, just not overnight. *Id.* at 34.

The court found Father's issue regarding the interview of Children meritless. It stated it interviewed Children both together and individually and ensured Children's separate opinions were heard. *Id.* at 34-35. The court further found it gave appropriate weight to Mother's mental health, noting Dr. Cardwell's evaluation was important in its analysis. *Id.* at 35-36. Regarding Mother's marijuana use, it noted she kept the marijuana in a secure container, used it outdoors and outside the presence of Children, and did not drive while under the influence. *Id.* at 36.

The court found it did not err in ordering Father to seek mental health treatment and to take anger management and parenting classes. *Id.* It found the evidence established that Father struggled to control his emotions, got into arguments at home, and behaved inappropriately in court and with

professionals. *Id.* at 36-37. It noted Dr. Cardwell recommended the treatment and the court agreed. *Id.* at 37.

We conclude the court did not abuse its discretion. The court appropriately considered and weighed all evidence as it discussed the factors. The record supports its findings, and it was not an abuse of discretion to modify custody to provide Mother with more time and to reduce Father's custody and remove overnight visits.

In his second issue, Father argues the trial court erred in ordering him to pay half of the cost of the custody evaluation even though its prior order directed Mother to pay. He says this was error, especially as the court allegedly did not explain its reasoning. He claims that the court was biased and attempting to punish Father and that the order was unreasonable.

Pennsylvania Rule of Civil Procedure 1915.8 provides:

> (a) The court may order the child(ren) and/or any party to submit to and fully participate in an evaluation by an appropriate expert or experts. The order, which shall be substantially in the form set forth in Rule 1915.18, may be made upon the court's own motion, upon the motion of a party with reasonable notice to the person to be examined, or by agreement of the parties. The order shall specify the place, manner, conditions and scope of the examination and the person or persons by whom it shall be made and to whom distributed. In entering an order directing an evaluation pursuant to this rule, the court shall consider all appropriate factors including the following, if applicable:
>
> > (1) the allocation of the costs, including insurance coverage, if any, attendant to the undertaking of the evaluation and preparation of the resultant report and court testimony of any appointed expert[.]

Pa.R.Civ.P. 1915.8(a)(1).

In its Rule 1925(a) opinion, the trial court pointed out it initially ordered the costs of the custody evaluation would be borne by Mother "without prejudice to the ultimate apportionment of such costs by subsequent agreement of the parties or order of court." Rule 1925(a) Op. at 26 (citation and emphasis omitted). It noted that Rule 1915.8 provides that the court may order an evaluation and allocate costs. *Id.* at 26-27. It found that after the hearing, it reallocated the costs because "Father's unstable mental health and behaviors throughout the pendency of the litigation necessitated the evaluation and rendered him responsible for a portion of th[e] costs." *Id.* at 27.

We conclude this was not error. Although the court initially ordered that Mother pay the entire cost of the evaluation, in that order it clarified that the allocation was without prejudice and could be modified by agreement of the parties or an order of the court. After the custody trial, the court reallocated the cost of the evaluation, requiring that Father contribute to the cost. Based on the initial order, this was not error.

In his last issue, Father argues the court erred in holding him in contempt of the April 2022 custody order. He claims the court provided no explanation or finding as to what Father did to violate the custody order and did not provide reasoning for finding he acted with wrongful intent. He claims he has followed the April 2022 order. He says because of the lack of explanation or findings, the court's award of counsel fees in the amount of $500 was unreasonable and an abuse of discretion.

- 21 -

The trial court found that it did not err in finding Father in contempt of the April 2022 order. *Id.* at 28. It found the orders were definite, clear and specific, he had notice of them, and he failed to comply by not responding to messages within 24 hours and failing to ensure A.B. took her medication, and found the actions were willful and done with wrongful intent. *Id.*

We conclude Father has waived this issue. In his brief, Father cites 23 Pa.C.S.A. § 5323 for the elements of contempt. He then argues that because the trial court opinion was silent on contempt, the court abused its discretion. However, he cites no law in support of this contention. He has therefore waived the issue. *See Saber v. Navy Fed. Credit Union*, 350 A.3d 965, 970 (Pa.Super. 2026) (finding claim waived where appellant failed to develop cognizable arguments with discussion and citation to relevant authority).

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

8/14/2026